UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO.  11-280 (MJD/JSM)

     Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

JAVIER HERNANDEZ-CORIA (5),
SUSANA BARRAGAN-SANCHEZ (6),
ADELAIDA BARRAGAN-SANCHEZ (7),
ROBERT ALAN DELFORIN (10),
HAROLD JAMES HURLEY (14), and
ERIKA ROMERO MONTENEGRO (16),

     Defendants.

     JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon Adelaida Barragan-Sanchez's Motion for Suppression of Evidence from Search and Seizure [Docket No. 194]; Adelaida Barragan-Sanchez's Motion to Suppress Statements [Docket No. 195]; Adelaida Barragan-Sanchez's Motion to Suppress Evidence from Interception of Wire or Oral Communication [Docket No. 196]; Erika Romero Montenegro's Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping [Docket No, 220]; Erika Romero Montenegro's Motion to Suppress Confession or Statement in the Nature of the Confessions [Docket No. 221]; Erika Romero Montenegro's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment [Docket No. 222].

Robert Alan Delforin's Motion to Suppress any Statements Made by Defendant [Docket No. 293]; Robert Alan Delforin's Motion to Suppress any Evidence Obtained as a Result

of any Illegal Searches [Docket No. 294]; Robert Alan Delforin's Motion to Suppress any Identification of Defendant [Docket No. 295]; Robert Alan Delforin's Motion to Suppress Evidence of Electronic Surveillance and Wiretapping [Docket No. 296]; Susana Barragan-Sanchez's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Derivative Device [Docket No. 336]; Harold James Hurley's Motion for Suppression of Evidence Obtained by Electronic Surveillance [Docket No. 338]; Harold James Hurley's Motion to Suppress Statements [Docket No. 339]; and Harold James Hurley's Motion to Suppress Evidence Obtained Through Illegal Search [Docket No, 340].

Assistant United States Attorney Steven L. Schleicher appeared on behalf of the Government; Gregory J. Schmidt appeared on behalf of Javier Hernandez-Coria who was present at the hearing; Barry V. Voss appeared on behalf Susana Barragan-Sanchez who was present at the hearing; Kevin M. O'Brien appeared on behalf Adelaida Barragan-Sanchez who was present at the hearing; Richard S. Virnig and Thomas H. Shiah appeared on behalf of Robert Alan Delforin who was present at the hearing; Jeffrey C. DeGree appeared on behalf Harold James Hurley who was present at the hearing; and Peter B. Wold appeared on behalf of Erika Romero Montenegro who was present at the hearing.

The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

**I.   ERIKA ROMERO MONTENEGRO'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT [DOCKET NO. 222]**

A.      **Factual Background**

Deputy Kristopher Peterson ("Deputy Peterson"), with the Douglas County Sheriff's Office in Omaha, Nebraska, testified that on May 26, 2011, he received an e-mail from his dispatcher, who had received information from the Oregon Drug Enforcement Agency ("DEA") office, that a vehicle involved with possible drug trafficking would be travelling through Omaha, Nebraska at approximately 8:00-9:00 p.m., with either Oregon, California or Minnesota plates.  See Hearing Transcript [Docket No. 445] ("Tr.") 15-16, 38.  Deputy Peterson knew the time the vehicle would be entering the Omaha area because the email provided that the vehicle would be leaving Des Moines, Iowa around 6:00 p.m., and Des Moines and Omaha were two hours away from each other.  Tr. 38-39.  The information received was that the vehicle was Toyota Camry of an unknown year and unknown color, with possibly female and male occupants.  Tr. 16, 38.

At about 8:16 p.m., at about 24th Street, Deputy Peterson saw a black Toyota Camry with Oregon plates heading westbound on Interstate 80 and observed that the driver's side tires drove completely over the yellow line on the left shoulder for about 200-300 feet.   Tr. 16-18.   Defendant Erika Romero Montenegro ("Montenegro") acknowledged that she was driving over the fog line before being pulled over.  Tr. 83. Deputy Peterson testified that such conduct is a traffic violation.  Tr. 17.  Deputy Peterson also noticed the vehicle swerving within its own lane.  Id.  Deputy Peterson stated that based on his experience and training, this driving conduct was indicative of intoxication, or impairment due to the out-of-state driver being tired and falling asleep at

3

the wheel.  Tr. 18.  Deputy Peterson conducted a traffic stop of the vehicle at approximately 8:18 p.m.  Tr. 16, 18, 32, 41.

Deputy Peterson approached on the passenger's side of the vehicle.  There was a male and female inside.  Tr. 18.  The female was driving.  Id.  The passenger rolled down his window and Deputy Peterson asked for the license of the driver.  Deputy Peterson testified that at that point, he could smell an overwhelming order of air freshener coming from the vehicle and he observed several highly caffeinated energy drinks scattered throughout vehicle.  Id.  Deputy Peterson testified that there were over three air fresheners scattered throughout the vehicle and over four energy drinks.  Tr. 42.  According to Deputy Peterson, it is not uncommon to have one or two air fresheners inside of a vehicle; however, the presence of several air fresheners scattered around or sprayed throughout the vehicle signified to him that the occupants were trying to mask some odor of illegal contraband.  Tr. 19.  The presence of energy drinks indicated to him that the occupants were travelling a great distance, were trying to get to their destination quickly, and needed to stay awake for longer periods of time. Id.  Deputy Peterson noted that there was no smell of narcotics or alcohol coming from the vehicle.  Tr. 43.  In the video of the stop, Deputy Peterson communicated to another officer in two separate instances that he had smelled the overwhelming odor of air freshener.  See Montenegro Ex. F (Time entries at 21:29, 21:36).[1]

Deputy Peterson took pictures of the interior of vehicle, claiming they would show the air fresheners and energy drinks.  Tr. 42.  Montenegro submitted exhibits, which

---

[1]    The time entries on the video do not match the times provided by Deputy Peterson.  No explanation was provided for this discrepancy of an hour.

were photographs of the exterior and interior of the vehicle.  <u>See</u> Montenegro Exs A,E.

While the mirror had no air freshener hanging from it, Deputy Peterson testified that one

of the air fresheners, which had a picture of a skull on it, was visible in Exhibit E

underneath the driver's seat, and that another was attached to the pink string visible by

the steering wheel in the same exhibit.  Tr. 61-62, Montenegro Exs. D, E.  Admitting

they were not visible in any of the photographs, Deputy Peterson testified that he

believed there was also one air freshener located in the center console and another air

freshener stuck between the ignition and the radio area.  Tr. 63.  As for the energy

drinks, Deputy Peterson testified that the energy drink containers were found on the

floor of the vehicle in the back compartment, and that he had not taken a picture of this

area.  Tr. 63-64.  In the video of the stop, Deputy Peterson communicated to another

officer prior to the search that he had seen 5-hour energy drinks in the back of the

vehicle when he was trying to retrieve Montenegro's shoes.  <u>See</u> Montenegro Ex. F

(Time Entry at 21:29).

Deputy Peterson obtained the driver's license from the driver, who was

Montenegro, and her registration and proof of insurance.  Tr. 19-20.  The driver's

license was an Oregon license and stated that Montenegro lived in Oregon.  Tr. 44.

Deputy Peterson asked Montenegro if she was okay to drive and Montenegro explained

she was tired.  Tr. 20.  Deputy Peterson informed Montenegro of the reason for the stop

and she acknowledged that she understood by shaking her head up and down.  <u>Id.</u>

Montenegro appeared to understand Deputy Peterson.  <u>Id.</u>

Subsequently, Deputy Peterson asked Montenegro to come back to his squad car so he could look over the vehicle paper work and to ask her some additional questions.  Id.  Deputy Peterson learned from Montenegro that she was traveling from Minnesota and that her ultimate destination was California.  Tr. 21.  Deputy Peterson asked Montenegro for her final destination in California; she responded that she did not understand the question.  Tr. 21.  When Deputy Peterson asked her if it was San Francisco, Montenegro agreed that this was her destination.  Id.  Deputy Peterson stated during the stop that he believed that Montenegro would have agreed to any city in California that he would have asked her.  See Montenegro Ex. F (Time Entry at 21:29-30).

At this point, Deputy Peterson believed that he was having difficulty communicating to Montenegro in English and even tried to use a translation program to communicate with Montenegro to no avail.  Tr. 21.  Deputy Peterson then made a request for a Spanish-speaking officer.  Tr. 21-22.  According to Deputy Peterson, he contacted the Spanish-speaking officer approximately 10 minutes after the stop took place.  Tr. 35.

Montenegro initially testified at the hearing that she only understood a couple of words in English, despite living in the United States for a long time.  Tr. 83-84.  She also testified that when Deputy Peterson asked for her in English for her driver's license, she understood his request and complied.  Tr. 84-85.  In addition, she testified that she provided registration documents to Deputy Peterson because he asked her for them; in response to Deputy Peterson's inquiry if she was okay to drive, she was able to respond

6

that she was tired; and she answered his inquiry as to where she was coming from, telling him it was Minnesota.  Tr. 85.

As to the registration information provided by Montenegro, Deputy Peterson stated that in February of 2011, the mileage for the vehicle was registered at just under 80,000 miles, but at the time of the stop, the odometer showed almost 103,000 miles. Tr. 22.  Deputy Peterson testified that this information indicated that the vehicle had travelled over 30,000 miles during a-month-and-a-half period, which was not typical.  Tr. 22, 41.

Based on his observations of the driver and the general description that was provided to him before the stop, the observations of the odometer and the other indicators about which he had testified, Deputy Peterson believed that the vehicle could contain contraband in the form of a large amount of currency.  Tr. 28.

Deputy Peterson testified that he provided an authorization form for consent to search the vehicle to Montenegro in both Spanish and English, which she appeared to read, and that a Spanish-speaking officer read the form to her.  Tr. 22-26, 45. Montenegro signed the consent to search form.  Tr. 82, Govt. Ex. 1.

After obtaining Montenegro's consent to search, Deputy Peterson testified that he went to get the passenger out of the vehicle and as he walked by, he looked at the wheel wells and could see that the underspray had been tooled, signifying that somebody might have been up in the wheel well searching around that area.  Tr. 26-

28.[2]   Based on his experience in doing drug interdictions on the highway, this observation indicated to Deputy Peterson that there might possibly be an aftermarket hidden compartment in the wheel well.  Tr. 28.  In searching the area, he found no such compartment.  Id.

The officers searched the vehicle for approximately 30 minutes and then decided to tow the vehicle to a safer location to complete the search.  Tr. 28-29.  A compartment was located in the back seat area on the driver's side area, which contained a large amount of currency.  Tr. 29.

Montenegro testified at the hearing that she moved to the side of the road because she thought that the police officer traveling behind her wanted to pass, as he was driving very close to her.  Tr. 78-79.  Montenegro denied the presence of any air fresheners because they made her dizzy.  Tr. 79.  Montenegro also denied the presence of any energy drinks in the vehicle.  Id.

**B.**   **Analysis**

---

[2]        Montenegro argued that the video of the traffic stop contradicts this testimony. Montenegro Mem., p. 4 (citing Montenegro Ex. F). According to Montenegro: "From the time of the stop at approximately 21:18 until the search of the car at approximately 21:55, Deputy Peterson does not appear to make any observations of the wheel well. He does however receive a phone call instructing him to look into the wheel wells at around 21:44." Id.  The video recording at 21:44 includes a conversation of Deputy Peterson with an unknown individual discussing looking in the wheel wells of the vehicle and subsequent video starting a 21:55 shows officers, after receiving consent to search the vehicle, looking in a wheel well.  See Montenegro Ex. F.

Montenegro argued that the evidence seized from her vehicle on May 26, 2011, after she provided police officers written consent to search her vehicle, should be suppressed because she was illegally seized prior to providing her consent to search. <u>See</u> Memorandum in Support of Motion to Suppress evidence Obtained in Violation of the Fourth Amendment ("Montenegro Mem.") [Docket No. 457]. p. 1.  She submitted that once Deputy Peterson's suspicions that she was impaired were alleviated by his determination that she was not intoxicated, and the other supporting indicators for his request for consent to search were determined not to be credible,[3] it was clear that immediately following the stop, Deputy Peterson shifted the purpose from a justified traffic stop to a drug investigation, and this did not amount to a brief extension of the investigation.  <u>Id.</u>, pp. 3-4.  Montenegro claimed that the "extent and duration of Deputy Peterson's focus on non-routine questions prolonged the stop 'beyond the time reasonably required' to complete its purpose."  <u>Id.</u>, (quoting <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005)).  As she was detained for nearly 30 minutes before the deputies began to search her car, Montenegro asserted that this prolonged detention violated her Fourth Amendment right to be free from unreasonable seizures.  <u>Id.</u>, p. 5.

The Government countered that Deputy Peterson properly extended the scope of the traffic stop based on a reasonable suspicion of criminal activity, and on the basis that the consent to search the vehicle was obtained about 33 minutes after the initial stop, which was not unreasonable considering the time needed to obtain her license

---

[3]     According to Montenegro, none of the photos of the car showed the presence of any energy drink containers or air fresheners.  Montenegro Mem., p. 4 (citing Tr. 58-59, 62-63; Exs. A-E).

and registration information, to engage in conversation regarding her impaired driving, to obtain itinerary information from her and to wait for a Spanish-speaking officer to better communicate with her.  See Government's Response to Defendants' Memoranda in Support of Suppression Motions ("Govt. Mem.") [Docket No. 466], pp. 4-5.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  "It is well established that a roadside traffic stop is a 'seizure' within the meaning of the Fourth Amendment."  United States v. Jones, 269 F.3d. 919, 924 (8th Cir. 2001).  However, "a traffic violation – however minor – creates probable cause to stop the driver of a vehicle."  United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (citations omitted).  This is true even if a valid traffic stop is a pretext for another investigation.  Id.  (citation omitted).  Additionally, law enforcement may conduct a search of an individual's vehicle without a warrant or probable cause if that person voluntarily consents to the search. See, e.g., United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000).

There is no dispute that Montenegro gave Deputy Peterson the consent to search her vehicle approximately 33 minutes after the stop, which the Court finds is a reasonable period of time given the circumstances.  In addition to addressing the reasons for a valid traffic stop, an officer may conduct a reasonable investigation, which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose."  United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995), cert. denied, 516 U.S. 936 (1995) (quoting

United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)); see also United States v. McCarty, 612 F.3d 1020, 1024-25 (8th Cir. 2010) ("During a lawful traffic stop, an officer may conduct a reasonable investigation. A reasonable investigation includes asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions, verifying the driver's identification and related documents, and asking questions about the driver's itinerary.") (citations omitted); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999) ("having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning") (citation omitted).

As part of his investigation, Deputy Peterson was able to and did obtain license and registration information from Montenegro. Further, Deputy Peterson legitimately took Montenegro out of her vehicle, placed her into his squad and asked her questions regarding her itinerary. Because he ran into a language barrier with Montenegro, Deputy Peterson appropriately asked for and waited for the arrival of an interpreter. Given these circumstances, the Court finds that the time delay from her initial stop to obtaining her consent to search the vehicle was not unreasonable.

Additionally, the Court finds that Deputy Peterson had a reasonable suspicion that criminal activity was afoot to detain Montenegro while the officer continued his investigation. If an officer's suspicions are further aroused in the course of a lawful stop, "the officer may expand the scope of the inquiry and detain the occupants of the

automobile for further investigation." United States v. Poulack, 236 F.3d 932, 936 (8th Cir. 2001); see also United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003) ("an investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop."); see also McCarty, 612 F.3d at 1025 ("'To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'") (quoting United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010)).  The reviewing court must then look at the totality of the circumstances, in light of the officer's experience to determine whether the officer had reasonable suspicion to expand the scope of the stop. See Poulack, 236 F.3d at 936 (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)); see also McCarty, 612 F.3d at 1025 ("Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience.") (quoting United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008)).

At the time of the stop, Deputy Peterson had knowledge from the DEA that a Toyota Camry that could be involved with narcotics, would be passing through Omaha between approximately 8:00-9:00 p.m., with either Minnesota, California or Oregon plates, and male and female occupants.  The vehicle stopped by Deputy Peterson was a Toyota Camry, with Oregon plates and a male and female occupant.  Further, Deputy Peterson was struck by an overwhelming odor of air fresheners in the car, which

suggested the hiding of the smell of narcotics, and saw several energy drink bottles, which was indicative of people trying to travel long distances quickly.  While Montenegro disputes the presence of air fresheners and energy drinks based on a lack of clear photographic evidence, the Court notes that the photographs corroborate, at least part, Deputy Peterson's assertion that there were air fresheners in the vehicle, and he testified that the energy drinks were on the floor of the back compartment for which there was no photograph.  Deputy Peterson's statements are further corroborated by the videotape of the stop during which he stated on two occasions that he smelled the strong odor of air freshener coming from the vehicle and he saw energy drinks in the back of the vehicle while retrieving Montenegro's shoes.  In addition, Deputy Peterson had information from the registration materials that the vehicle had travelled over 30,000 miles in a short period of time.  Finally, while Montenegro knew she was going to California, she did not know her final destination until Deputy Peterson suggested San Francisco.

Based on the totality of these circumstances, Deputy Peterson had reasonable suspicion to expand the scope of his investigation beyond the traffic stop, to investigate possible narcotics violations connected with the vehicle, and to detain Montenegro, as the driver, while doing so.

For all of the reasons stated above, the Court finds that Montenegro's motion to suppress evidence discovered in the vehicle should be denied.

II.   **ERIKA ROMERO MONTENEGRO'S MOTION TO SUPPRESS CONFESSION OR STATEMENT IN THE NATURE OF THE CONFESSIONS [DOCKET NO. 221]**

    A.   <u>**Factual Background**</u>

DEA Special Agent Jay Anderson ("Agent Anderson") currently works at the San Francisco Field Division and previously worked out of the Oakland California Resident Office.  Tr. 46-47.  On September 15, 2011, Agent Anderson interviewed of Montenegro at the request of the Minneapolis DEA Field Office.  Tr. 47-48.  The only information that Agent Anderson knew about the case was that Montenegro was involved in a traffic stop in Nebraska, a large amount of currency was found in her vehicle, and he was aware of methamphetamine distribution in the Minneapolis area.   Tr. 48, 54.  Montenegro had been arrested earlier on September 15, 2011, pursuant to a federal arrest warrant.  Tr. 48-49.  Agent Anderson testified that he assisted in Montenegro's arrest.  Tr. 53.   During the arrest, Montenegro had notified officers that she had minor children who were in school at the time.  Tr. 54.

The interview started approximately at 12:50 p.m.  Tr. 48.   Agent Anderson testified that Montenegro was calm and was aware of what was going on before the start of the interview.  Tr. 49.  Agent Anderson stated there was no indicia of alcohol consumption or intoxication, use of controlled substances, and Montenegro appeared to be aware of what was happening.  <u>Id.</u>  Agent Anderson enlisted the assistance of a Spanish-speaking officer, Antonio Gregoso ("Officer Gregoso"), with the Oakland School Police, to communicate with Montenegro, as it was clear that she could not communicate in English.  Tr. 49-50, 54.  Using Officer Gregoso as an interpreter,

Montenegro was administered a <u>Miranda</u> warning using the standard DEA form 13-A <u>Miranda</u> card to administer the rights.  Tr. 50.  The card had both an English side and a Spanish side.  Tr. 50-51; Govt. Ex. 44.  Officer Gregoso read the <u>Miranda</u> warning to Montenegro in Spanish.  Montenegro understood the warnings provided to her.  Tr. 51.

The interview took approximately 40-50 minutes.  Tr. 52.  Montenegro was not handcuffed during the interview.  Tr. 51-52.  At no time during the interview did she ask for an attorney or indicate a desire not to speak with the officers.  Tr. 52.   Montenegro indicated that she understood her rights and she agreed to provide the officers with a statement.  <u>Id.</u>  Montenegro appeared to understand the questions asked.  <u>Id.</u>

Officer Fregoso testified that on September 15, 2011, he received a call from Agent Anderson asking him to assist with an interview in Spanish.  Tr. 67-68.  Upon arrival at the Oakland Resident Office, Agent Anderson quickly briefed him on the situation, he then met Montenegro, and the interview started.  Tr. 68.  According to Officer Fregoso, prior to reading the <u>Miranda</u> rights to her, he introduced himself and he found her sober, calm, and collected, but somewhat confused as to why she was there. <u>Id.</u>  Officer Fregoso read in Spanish the <u>Miranda</u> rights provided to him by Agent Anderson to Montenegro.  Tr. 68-69.  Montenegro testified that she is fluent in Spanish and is able to read Spanish.  Tr. 81.  Montenegro also testified that she was given the Spanish <u>Miranda</u> rights.  Tr. 82.  Montenegro indicated that she understood her rights and she was willing to give a statement.  Tr. 69.  Officer Fregoso testified that at no time did Montenegro ask for an attorney or state that she did not wish to speak to the officers.  Tr. 67-70.  The interview lasted for about an hour.  Tr. 70.

According to Officer Fregoso, at no time did he threaten Montenegro in any way or make any promises in order to get her to make a statement or waive her rights.  Id. When asked on cross-examination as to whether he told Montenegro about the potential necessity of calling authorities to deal with her children, Officer Fregoso testified:

> Not that I recall. I remember asking her if she had someone to take care of her children and we could assist her with that. But, I don't remember telling her we were going to call the authorities to take her children.

Tr. 75.

Montenegro testified that she spoke with the officers "[b]ecause the agent who had just left said that that was my only chance that I had so that they wouldn't take away my children. And they would then stop that call."  Tr. 80.  The officer held his phone and told her that he could stop that from happening, he mentioned the name of a company and that they could retrieve her children wherever they were.  Id.  Montenegro said that the officer told her that she only had to tell officers "whose money it was."  Id.

On re-direct examination, Officer Fregoso testified as follows:

> Q. Sir, Ms. Montenegro testified at the motions hearing after you left and indicated that you told her that if she gave you a statement, you would be able to avoid having her children taken away.

> A. No. We told her that -- she mentioned her children, and we told her that we would let her call whoever she needed to pick up her children from school, I believe it was. They were at school.

> Q. Was the child care issue or the discussion about children in any way related to the Miranda waiver?

16

A. Not to the <u>Miranda</u> waiver, no.

Q. Did you condition her being able to take care of her child care obligations in any way on her agreeing to talk to you?

A. Not that I recall.

Q. Or waiving her <u>Miranda</u> rights?

A. No.

Q. Can you recall specifically what you told Ms. Montenegro in its entirety regarding her children?

A. I remember telling her that once -- she brought up the question about her children, her children would be at school and all this other -- somebody needed to pick them up or -- pick up her children from school. And so we would give her the opportunity to call someone to pick up her children, who she wanted to pick up her children. And she mentioned she had her father, and her boyfriend, I believe, and we told her we would give her the opportunity to call them so they could pick the children up from school.

Q. Did that take place before the Miranda warning?

A. I believe that took place after the Miranda. I am not exactly sure.

Q. Did you tell her that you would allow her to make these child care arrangements if she would just tell you whose money it was?

A. Not that I recall.

Tr. 108-110.

B.      <u>Analysis</u>

Montenegro has moved to suppress her September 15, 2011 statement to law enforcement on the basis that an officer told her that talking with officers was the only chance she had to avoid having the police take her children away from her.   <u>See</u> Memorandum in Support of Motion to Suppress Confession or Statements in the Nature of Confessions [Docket No. 456], pp. 2-3.   According to Montenegro, such an express or implied promise critically impaired her capacity to agree to give a statement.   <u>Id.</u>

In opposition, the Government attacked the credibility of Montenegro, arguing that her claims were a fabrication.   <u>See</u> Govt. Mem., p. 7.   In support, the Government pointed to other fabrications by Montenegro including: she claimed she drove over the fog line in Nebraska because the officer was following her very closely, when the testimony of Deputy Peterson and the video showed otherwise; and her initial testimony that she could not communicate in English, was contradicted by her later testimony that she was able to communicate in English with Deputy Peterson regarding her license and registration, her trip and whether she was able to drive.   <u>Id.</u> at p. 8.   According to the Government, Montenegro had a motive to lie in order to suppress evidence in serious narcotics case against her, whereas the officers that were involved with taking her statement had no motive to perjure themselves, especially when they were only conducting a one-time assist for an out of state investigation.   <u>Id.</u>, pp. 8-9.   In short, the Government contended that Montenegro's statement, following the <u>Miranda</u> warning, was voluntary.   <u>Id.</u>, pp. 9-10.

A waiver of <u>Miranda</u> rights is valid if it satisfies the following criteria:  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (citing <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994)).  "The determination of whether an accused has knowingly and voluntarily waived his <u>Miranda</u> rights depends on all the facts of each particular case."  <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir. 1985) (citing <u>Fare v. Michael C.</u>, 442 U.S. 707, 724-25 (1979)).  Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's <u>Miranda</u> rights have been waived.  <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quoting <u>Fare</u>, 442 U.S. at 725).

The outcome of this dispute rises and falls on the credibility of Agent Anderson and Officer Fregoso versus that of Montenegro regarding whether the officers threatened to take her children away from her.  Having considered all of the evidence, this Court finds Agent Anderson and Officer Fregoso's testimony is more believable.  First, the Court has issues with Montenegro's the credibility based in part on her testimony that there were no air fresheners in her vehicle because they make her sick, when the photographs showed at least one air freshener in the vehicle and the videotape recording reflects Deputy Peterson remarking at least twice about the smell of

air fresheners in the vehicle.  In addition, Montenegro testified that there were no energy drinks in the vehicle, despite Deputy Peterson's statements in the videotape recording that he observed energy drinks in the back of the vehicle as he retrieved her shoes. Further, her conflicting testimony regarding her proficiency in English placed her veracity in doubt.

On the other hand, Agent Anderson and Officer Fregoso had no vested interest in this case to lie about coercing Montenegro into giving a statement, especially given their only involvement in this investigation was to interview Montenegro at the request of the Minnesota DEA field office.   In other words, Agent Anderson and Officer Fregoso lacked any motivation to perjure themselves to this Court, while Montenegro surely was motivated to provide testimony to negate a finding of guilt and avoid her incarceration. See United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994) (finding that an enforcement officer's testimony may be given more weight than that of a defendant who has "a great deal of self-interest in having the testimony suppressed.").

Based on this credibility finding, this Court concludes that there no threats or promises were made to Montenegro so as to render her statement involuntary.  Rather, the evidence establishes that Montenegro agreed to give a statement to police after being apprised of her rights under Miranda.  Her motion to suppress statements should be denied.

III.  **HAROLD JAMES HURLEY'S MOTION TO SUPPRESS STATEMENTS [DOCKET NO. 339] AND HAROLD JAMES HURLEY'S MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH ILLEGAL SEARCH [DOCKET NO. 340]**

A.  <u>**Factual Background**</u>

Michael Frank Meyer ("Officer Meyer"), a St. Paul Police Officer assigned to the DEA as a task force officer, testified that he has been involved in a large narcotics investigation dealing with another co-defendant Uriel Magana-Farias ("Magana-Farias"). Tr. 93-95. This investigation included participation in court-authorized Title III wiretaps, a great deal of surveillance, and coordinating traffic stops. Tr. 95-96.

Officer Meyer testified that as part of his involvement in the investigation and prior to any traffic stop of defendant Harold James Hurley ("Hurley"), he knew that an individual by the name of Jose Oceguara ("Oceguara") was involved in drug trafficking. Tr. 97. Specifically, Officer Meyer observed Oceguara in a vehicle with a man named Bonitas and another person who had arrived on a motorcycle. <u>Id.</u> The person on the motorcycle got out of the vehicle in less than a minute, and then left. <u>Id.</u> The individual was subsequently subjected to a traffic stop and a pound of methamphetamine was recovered. <u>Id.</u> In a post-<u>Miranda</u> statement, the motorcycle driver told officers that he had received that methamphetamine from Oceguara. <u>Id.</u> The person on the motorcycle also told officers that he had done numerous deals with these two individuals. Tr. 98. Officer Meyer testified that he also knew as of July 25, 2011, through the monitoring of telephone calls, that Oceguara had made arrangements for a person known as James Jeanetta ("Jeanetta") to buy methamphetamine, and he knew that Jeanetta had a

criminal history for methamphetamine and that Jeanetta's family was very well known for methamphetamine.  Tr. 99.

On July 25, 2011, officers observed Bonitas meet up with a man by the last name of Sanchez at a superette.  Tr. 99-100.  Officers then observed Jeanetta arriving and then leaving with Bonitas to go back to his residence.  Tr. 100.  According to Officer Meyer, officers knew that Sanchez was one of the individuals who would deliver methamphetamine to Oceguara and Bonitas and that Sanchez is a person from whom various controlled purchases of methamphetamine had been made.  Id.  Based on the officers' surveillance, they believed that the interaction at the superette was consistent with a hand-to-hand transaction.  Tr. 101.  During the surveillance of the Jeanetta residence, officers observed a white vehicle pull into the driveway of the residence, an individual later identified as Hurley got out of the vehicle and went into the house, stayed in the house for less than five minutes, came out and then left.  Id.  Officers had had no contacts or dealings with Hurley prior to July 25.  Tr. 115.  Based on the relatively short interaction between Hurley and Jeanetta's residence, Officer Meyer believed that Hurley had likely picked up narcotics.  Tr. 101-02.  Officer Meyer wanted the vehicle stopped in order to determine who was driving the vehicle.  Tr. 102.

Officer Meyer contacted St. Paul Police Officer Chad Dagenais ("Officer Dagenais") to conduct the stop.  Tr. 102.  Officer Dagenais testified that in following the suspect vehicle, he noticed that the vehicle had a rear brake light out, which was an equipment violation and a legal reason to stop the vehicle.  Tr. 124.  The driver identified himself as Hurley.  Tr. 125.  During the stop, Officer Dagenais called Officer

22

Meyer for direction on how to proceed with regard to searching the vehicle and Officer Meyer told him to search the vehicle if he had probable cause to search the vehicle or consent from the driver.  Tr. 126.  Officer Dagenais did not believe he had probable cause to search the vehicle.  Id.  Officer Dagenais asked and received consent from Hurley to search his vehicle.  Id.  Because Officer Meyer did not want to do anything to tip off Hurley to the investigation, Officer Dagenais performed a very brief search of the interior of the vehicle and found no contraband.  Tr. 126-27.  Officer Dagenais did not cite Hurley and released him from the scene.  Tr. 127.

Officer Meyer testified that on August 2, 2011, officers had set up surveillance of Jeanetta's residence.  Officers observed Bonitas arrive at the residence with Oceguara and saw Sanchez arrive within minutes thereafter.  Tr. 103-104.  Bonita was observed having a brief conversation with Jeanetta, but officers did not know if a hand-to-hand transaction had occurred.  Tr. 104.  Bonitas and Oceguara then left the residence.  Id. Officers followed Jeanetta when he left his residence and observed him travelling to a business located on University Avenue.  Id.   Jeanetta stayed at the business for a short period of time.  Tr. 104, 118-19.  Officers then observed him driving from that business to an AutoZone on the border of Oakdale and Maplewood.  Tr. 104, 116.  Officer Meyer testified that Jeanetta went into the AutoZone, came outside with a female employee, and they had some type of diagnostic tool with them to look at his truck.  Id.  The AutoZone employee helped him out for a short time, and then went back into the store.

Id. Jeanetta then just sat at the AutoZone until Hurley's vehicle arrived.[4]  Tr. 104-05.  A surveillance officer observed Jeanetta get out of the truck, go over to Hurley's open driver's window, lean in and give him something.  Tr. 105.   Although it was not determined at that time what it was, the conduct was very consistent with a hand-to-hand narcotics transaction.  Id.  This conversation and exchange took approximately 10 to 15 seconds.  Tr. 106.  Based on these observations, his experience and training and what he knew about the various individuals involved in this investigation, Officer Meyer believed he had probable cause to believe that Hurley had picked up narcotics from Jeanetta.  Tr. 106, 119.  Officers followed Hurley's vehicle to Interstate 94, and Officer Meyer contacted St. Paul Officer Todd Bjorkman ("Officer Bjorkman") to conduct a stop, as he believed that the vehicle contained methamphetamine.  Tr. 106.

Officer Bjorkman testified that on August 2, 2011, he was contacted by Officer Meyer and was told that there was a vehicle going westbound on Interstate 94 that he needed stopped and described that it was a Dodge Dynasty, or that type of vehicle, traveling at a high speed rate of speed.  Tr. 133.  Officer Bjorkman was also given the plate number of the vehicle.  Id.  Officer Bjorkman was on 7th and Lafayette on the entrance ramp to Westbound Interstate 94 when he saw a white Chrysler New Yorker pass him at a high rate of speed, and at a higher speed than any other vehicles surrounding it.  Id.  Officer Bjorkman followed the vehicle to Interstate 35 at the Maryland Avenue exit, where it exited the Interstate.  Tr. 133-34.  Officer Bjorkman then observed the vehicle run through a red stoplight, which is a traffic violation.  Tr. 134.

---

[4]     Officers noted that the vehicle had the same plates as the vehicle that had been stopped on July 25.  Tr. 105.

Officer Bjorkman stopped the vehicle.  Id.  Officer Bjorkman obtained the driver's license of the driver, which identified him as Hurley.  Tr. 134-35.

After going back to his squad car, Officer Bjorkman made a telephone call to Officer Meyer to tell him what had occurred and the identity of the driver.  Tr. 135. Officer Bjorkman testified that prior to talking with Officer Meyer, he did not have an independent basis or probable cause to search Hurley's vehicle for narcotics.  Tr. 135-38.  Officer Bjorkman stated that Officer Meyer told him to search the vehicle due to a suspected narcotic transaction.  Tr. 136.  Officer Meyer confirmed that he instructed Officer Bjorkman to search the vehicle because there was probable cause to believe that the narcotics would be found in the vehicle.  Tr. 120.  During the search of the vehicle, Officer Bjorkman discovered in the center console a brown paper bag that contained four baggies that appeared to contain methamphetamine or cocaine.  Tr. 136. Id.  Based on this discovery, Officer Bjorkman arrested Hurley.  Id.

### B.   **Analysis**

Hurley argued that the evidence of methamphetamine seized from his vehicle on August 2, 2011 should be suppressed because officers lacked sufficient probable cause to believe that there was evidence of narcotics present in his vehicle.  See Defendant Hurley's Memorandum in Support of Motion to Suppress ("Hurley Mem.") [Docket No. 459], pp. 3-5.  Specifically, Hurley asserted that the only evidence in possession of the officers prior to the August search was the July 25 search of his vehicle that yielded no narcotics, his contact with an individual who was engaging in a legitimate business transaction, and his subsequent speeding and running a stop light.  Id., p. 4.  As to the

motion to suppress statements, Hurley asserted that this motion was derivative of the illegal stop.  Tr. 139.

The Government contended that the officers had probable cause to believe narcotics evidence would be inside Hurley's vehicle based upon the totality of the circumstances.  According to the Government an experienced narcotics detective, who was involved in a wiretap investigation, saw several known targets of the investigation engaged in what appeared to be a hand-to-hand drug transaction with Jeanetta, an individual with a criminal history involving methamphetamine, and after that transaction, Hurley was observed receiving an item from Jeanetta in a 10-15 second transaction in the parking lot of a store and then making an attempt to get home in a hurry.  See Govt. Mem., p. 15.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).  "One such exception is the automobile exception, which allows law enforcement to 'search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'" United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011) (quoting United States v. Davis, 569 F.3d 813, 817 (8th Cir. 2009), quoting United States v. Cortez–Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam)). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a

particular place.'" United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Prior to the August 2, 2011, officers had information via Title III wiretaps, surveillance, and coordinating traffic stops that Oceguara and Bonitas were involved in trafficking methamphetamine and that Oceguara had purchased his methamphetamine from Jeanetta. Officers also knew that Sanchez was one of the persons who would deliver the methamphetamine to Oceguara and Bonitas, and that Sanchez was a person from whom various controlled purchases of methamphetamine had been made. On August 2, 2011, surveillance officers observed a brief contact between Sanchez, Oceguara, Jeanetta and Bonitas at Jeanetta's residence. Thereafter, officers followed Jeanetta until he reached an AutoZone and deal with an employee regarding his vehicle. After Jeanetta's contact with the AutoZone employee terminated, officers observed Hurley's vehicle, which had been seen at Jeanetta's residence on July 25, 2011, enter the AutoZone parking lot. A surveillance officer observed Jeanetta get out of the truck, go over to Hurley's open driver's window, lean in and give him something, and this conduct, which took approximately 10 to 15 seconds, was consistent with a hand-to-hand narcotics transaction. Hurley was then seen driving away at excessive speed and running a red light, which officers believed was consistent with someone who had just picked up narcotics and wanted to get home quickly.

This Court finds that all of this conduct and information provided the officers with probable cause to believe that a hand-to-hand narcotics transaction had just taken place and that there was a fair probability that narcotics would be found in Hurley's

vehicle.  As such, Hurley's motion to suppress evidence, and his companion motion to suppress statements, should be denied.

## IV.  ADELAIDA BARRAGAN-SANCHEZ'S MOTION FOR SUPPRESSION OF EVIDENCE FROM SEARCH AND SEIZURE [DOCKET NO. 194]

### A.  Factual Background

Oakdale Police Officer Kevin Merkling ("Officer Merkling") testified that he was a part of the DEA task force.  Tr. 151.  On September 6, 2011, Officer Merkling had located a vehicle outside of an apartment located on Geneva Avenue in Oakdale, Minnesota, that was being used by Adelaida Barragan-Sanchez ("Barragan-Sanchez"). Tr. 152, 158.  According to Officer Merkling, officers had set up surveillance in the event that police wanted to arrest anyone that had left the apartment.  Id.  While the officers were waiting, the Oakdale Police Department received a 911 call at approximately 10:57 p.m. for a medical situation inside the apartment involving a child who was not breathing.  Id.  Officer Merkling and other officers responded to the medical call and subsequently the mother, Barragan-Sanchez, and her child were taken to the hospital via an ambulance.  Tr. 153, 159.  Officer Merkling testified that detectives from the police department remained on the scene because at the time they did not know the circumstances of the medical emergency or if they would be called upon to investigate a death.  Tr. 162.  Officer Merkling stated that he remained behind at the residence and spoke with the leaseholder of the apartment, Leonela Gonzalez ("Gonzalez").  Tr. 154-55.

Based on his conversations with the manager of the building and Gonzalez, Officer Merkling believed Gonzalez was the person who had authority and control over the apartment.  Tr. 154-155.  Officer Merkling asked Gonzalez for consent to search the apartment and provided her with a written form to authorize the consent.  Id.  Officer Merkling testified that Gonzalez was able to read the form and understood its contents.  Tr. 155-56.  Gonzalez gave Officer Merkling consent to search the apartment.  Tr. 56; Govt. Ex. 46.

With that consent, Officer Merkling searched the apartment and discovered $11,000 in United States currency located in several items piled together, including a purse.  Tr. 157.  Gonzalez and the other person listed on the lease, Mirna Maldonado, told Officer Merkling that the items from which the officers recovered the money belonged to Barragan-Sanchez.  Id.

At some point, Officer Merkling learned from Gonzalez that Barragan-Sanchez and her two infant children had been staying at the apartment for one to two days and were staying in the south bedroom of the apartment.  Tr. 162-63.  The bedroom was a small child's bedroom that included a diaper bag and some other personal effects and items belonged to Barragan-Sanchez and her minor children.  Tr. 163.  Officer Merkling also testified that Gonzalez had an infant with her as well as a toddler at the time of search.  Tr. 161.

## B.  **Analysis**

Barragan-Sanchez has moved for the suppression of evidence resulting from a search on September 6, 2011 of her personal effects, including her purse, in an

29

apartment located on Geneva Avenue in Oakdale, Minnesota.  See Memorandum in Support of Motion to Suppress evidence as Result of Search ("Barragan-Sanchez Mem.") [Docket No. 468], p. 1.  Barragan-Sanchez argued that she has standing under the Fourth Amendment to seek suppression of the evidence as an overnight guest in a host's residence.  Id., pp. 3-4.  In addition, Barragan-Sanchez claimed that police officers never obtained her consent to search her room in the apartment or the purse in the room, and that neither the lessees nor the landlord had the authority to allow a search of her purse where it was never established that they were allowed to use the purse or that it was kept in a common area of the apartment.  Id., pp. 4-5.  Further, while Barragan-Sanchez acknowledged that exigent circumstances existed to allow the officers to enter the apartment due to the emergency call about the child, once those exigent circumstances ceased, there was no exception that allowed the officers to conduct a search without a warrant.  Id., p. 5.  Alternatively, even if exigent circumstances existed, Barragan-Sanchez maintained those circumstances did not justify officers looking behind closed doors or searching through her personal belongings, particularly where the infant was rendered care in the common area until the ambulance arrived.  Id., p. 6.

The Government agreed that an overnight guest has a reasonable expectation of privacy and "standing" to challenge a search.  See Government's Response to Defendant Barragan-Sanchez's Memorandum in Support of Motion to Dismiss [Docket No. 476], p. 3.  Nevertheless, the Government argued that the leaseholder of the apartment, Gonzalez, had the authority to give consent to the search of the apartment

and the belongings in it, especially considering that Barragan-Sanchez was not present when the officers obtained the consent to search and actually searched the apartment. Id., pp. 4-5 (citing United States v. Buckles, 495 F.2d 1377 (8th Cir. 1974)).  In the alternative, the Government submitted that even if Gonzalez lacked the actual authority to authorize the search of Barragan-Sanchez's personal belongings, Gonzalez's consent was still effective because officers reasonably believed that she had authority to consent to the search.  Id., pp. 5-7.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures.  U.S. CONST. amend. IV; see also Gates, 462 U.S. at 230, 235.  "The Fourth Amendment protects against unreasonable searches and seizures, but its protections are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched." United States v. Wiest, 596 F.3d 906, 909 (8th Cir. 2010) (internal quotation marks omitted).  The "'status as an overnight guest is alone enough to show that defendant had an expectation of privacy in the home that society is prepared to recognize as reasonable." Wiest, 596 F.3d at 909 (quoting Minnesota v. Olson, 495 U.S. 91, 96-97 (1990).  "'From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with . . . a place where [the guest] and his possessions will not be disturbed by anyone but his host and those his host allows inside.'" Wiest, 596 F.3d at 909-10 (quoting Olson, 495 U.S. at 99) (emphasis added); see also United States v. Oates, 173 F.3d 651, 656 (8th Cir. 1999) (status as an

overnight guest creates a reasonable expectation of privacy against anyone but the host and those the host allows inside) (citation omitted).

Based on these precepts, Barragan-Sanchez, as Gonzalez's guest in her apartment, had a reasonable expectation of privacy from everyone, except Gonzalez and anyone Gonzalez allowed inside of the apartment.  This right to privacy includes Barragan-Sanchez's possessions in the apartment.  See also United States v. Buckles, 495 F.2d 1377, 1381-82 (8th Cir. 1974) ("The consent of a joint occupant of a residence to search the premises jointly occupied is also valid against the co-occupant.   In Maxwell, the defendant also argued that his coat was an item of such personal nature that it could not be seized without his consent. We rejected the proposition saying: 'This argument overlooks the consent to the officers' acquisition of the coat by a person having the proprietary interest in the premises where it was. * * * It was an item which freely came into the hands of the authorities by one who had the right to make it available to them. * * *'") (internal citation omitted) (quoting Maxwell v. Stephens, 348 F.2d 325 (8th Cir. 1965), cert. denied, 382 U.S. 944 (1965)).  No evidence or testimony was elicited that Gonzalez was precluded from going into the room in her own apartment where Barragan-Sanchez's purse and bags were located, nor was Barragan-Sanchez present to object to any search.  Therefore, Barragan-Sanchez could not have a reasonable expectation of privacy against individuals, including the police, who Gonzalez, as the leaseholder, provided consent to search the apartment.

Furthermore, even if Gonzalez did not have actual authority to consent to the search the apartment room and its contents, the Court finds that Gonzalez had apparent authority to authorize the police to search the apartment and the possessions inside–

> [e]ven if the third party lacked the requisite common authority, the Fourth Amendment is not violated if the police reasonably believed the consent was valid. See Illinois v. Rodriguez, 497 U.S. 177, 188-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In such a case, the critical inquiry is whether the facts available to the police at the time the consent is given would warrant a person of reasonable caution to believe the consenting party had authority over the place to be searched. See United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006).

United States v. Hilliard, 490 F.3d 635, 639 (8th Cir. 2007).

With regard to apparent authority, "[t]he relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997) (citing Rodriguez, 497 U.S. at 188); see also United States v. James 353 F.3d 606, 615 (8th Cir. 2003) (citation omitted) (providing that the inquiry into apparent authority is whether "the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched") (citations omitted).

Prior to the search of the apartment, Officer Merkling had knowledge from the manager of the apartment complex that Gonzalez was one of the individuals listed on the lease. Based on his conversation with the manager, Officer Merkling believed that Gonzalez had authority and control over the apartment. When Officer Merkling sought

consent from Gonzalez to search the apartment, Barragan-Sanchez had left the apartment in an ambulance.   The voluntary consent to search signed by Gonzalez provided as follows:

> I hereby authorize representatives from the Oakdale Police Department to conduct a complete search of <u>my property</u> and the contents within.   The property to be searched is described as follows: Apt #XXX at XXXX Geneva Ave – Whole Apt. . . .

<u>See</u> Govt. Ex. 46 (emphasis added).

Based on the information received from the apartment manager and Gonzalez, the Court finds that a reasonable officer could believe that Gonzalez, as the consenting party, had authority over the entire premises.   While Barragan-Sanchez suggested that the officers should have that known that only she had control over the room given the presence of a diapers bag, Barragan-Sanchez ignores the testimony of Officer Merkling that Gonzalez had an infant with her as well as a toddler.   Tr. 161.   Only after the items were found did Gonzalez state that they belonged to Barragan-Sanchez.   Tr. 157, 163. In any event, as stated previously, Barragan-Sanchez was not present when officers obtained consent from Gonzalez or during the search so as to challenge any assertion that Gonzalez lacked the requisite authority to allow the search of the room of the apartment and the contents within it.

For all of the reasons stated above, the Barragan-Sanchez's motion to suppress the evidence located in the apartment should be denied.

V.  **ROBERT ALAN DELFORIN'S MOTION TO SUPPRESS ANY STATEMENTS MADE BY DEFENDANT [DOCKET NO. 293]; DEFENDANT ROBERT ALAN DELFORIN'S MOTION TO SUPPRESS ANY EVIDENCE OBTAINED AS A RESULT OF ANY ILLEGAL SEARCHES [DOCKET NO. 294]; DEFENDANT ROBERT ALAN DELFORIN'S MOTION TO SUPPRESS ANY IDENTIFICATION OF DEFENDANT [DOCKET NO. 295]**

Robert Alan Delforin ("Delforin") filed several boilerplate motions to suppress evidence, statements, and identification.  Delforin failed to identify the specific evidence he wanted to suppress or the basis as to why the evidence should be suppressed.  Even after the Court invited supplemental briefing by the parties, Delforin filed no memoranda in support of his motion to suppress.  On this basis alone, the Court finds that the motion to suppress should be denied.  See United States v. Edwards, 563 F. Supp.2d 977, 994 (D. Minn. 2008).

In any event, as to the motion to suppress evidence, the only evidence that was taken from Delforin was a belt, a multi-tool, keys, jewelry, lighters, a cell phone, a flashlight a drug pipe and a portable scale.  See Govt. Ex. 4, Tr. 148-49.  Deputy Nathan Matthews ("Deputy Matthews") with the United States Marshall's Office testified that on October 12, 2011, he executed an arrest warrant for Delforin issued by United States District Judge Susan R. Nelson.  Tr. 144-45, Govt. Ex. 45.  Deputy Matthews stated that officers located Delforin at a St. Paul residence and when officers attempted to execute the arrest warrant, Delforin fled.  Tr. 146-47.  After officers arrested and handcuffed Delforin, they conducted a pat down search of Delforin in order to conduct an inventory of the items in his pockets and for officer safety.  Tr. 147-48.

"A full search of an arrestee and the area within an arrestee's immediate control for both weapons and evidence may be made during a search incident to arrest." United States v. Jones, 479 F.3d 975, 978 (citing United States v. Hrasky, 453 F.3d 1099, 1100-01 (8th Cir. 2006)).   Because officers arrested Delforin pursuant a court issued warrant, they were entitled to conduct a search of his person.   Therefore, Delforin's motion to suppress evidence should be denied.

As for Delforin's motion to suppress statements, Deputy Matthews testified that he did not received any statement from Delforin and the only statement made by Delforin was that he did not want to go to jail.   Tr. 150.   There is no evidence in the record that this statement was anything but a spontaneous utterance by Delforin. "'Volunteered statements of any kind are not barred by the Fifth Amendment.'"   United States v. Butzin, 886 F.2d 1016, 1018 (8th Cir.1989) (quoting Miranda v. Arizona, 384 U.S. 436, 478 (1966)).   As such, Delforin's motion to suppress statements should be denied.

Finally, there was no evidence presented in the submissions or at the hearing that there were any identifications of Delforin.   Thus, Delforin's motion to suppress identifications should be denied.

VI.   **ELECTRONIC SURVEILLANCE MOTIONS: ADELAIDA BARRAGAN-SANCHEZ'S MOTION TO SUPPRESS EVIDENCE FROM INTERCEPTION OF WIRE OR ORAL COMMUNICATION [DOCKET NO. 196]; ERIKA ROMERO MONTENEGRO'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM ELECTRONIC SURVEILLANCE AND WIRETAPPING [DOCKET NO. 220]; ROBERT ALAN DELFORIN'S MOTION TO SUPPRESS EVIDENCE OF ELECTRONIC SURVEILLANCE AND WIRETAPPING DOCKET NO. 296]; AND SUSANA BARRAGAN-SANCHEZ MOTION TO SUPPRESS THE CONTENTS OF ANY INTERCEPTED WIRE OR ORAL COMMUNICATIONS AND DERIVATIVE DEVICE [DOCKET NO. 336]** [5]

---

[5]      Montenegro filed a boilerplate motion to suppress multiple wiretaps authorized in this case stating only that "government has failed to demonstrate the necessary necessity to justify the wire taps."  See Docket No. 220.   Montenegro filed no memorandum in support of this argument and provided no evidence to support her assertion.   The only representation by counsel at the hearing was that the "wiretap motion [ ] was based on the four corners."  Tr. 87.

In Delforin's boilerplate motion to suppress the wiretap, he only asserted that "the government has failed to demonstrate the necessary necessity to justify the wire taps" and that the "government has failed to minimize intercepted conversations as required by law."  See Docket No. 296.  Delforin filed no memorandum in support of this motion, made no argument at the hearing and provided no evidence to support his position.

Susana Barragan-Sanchez's also filed a boilerplate motion to suppress and all evidence obtained from electronic surveillance on the grounds that the unidentified application and order do not contain the identity of all persons known to be committing offenses and whose communications would be intercepted; failed to set forth other investigative techniques used and why they could not be used; failed to contain a showing of probable cause that communications regarding narcotics would be intercepted; contained unidentified misrepresentations; failed to minimize the interception of communications; and the intercepting officers did not terminate the interception upon the attainment of the authorized objective.  See Docket No. 336.  In addition, Susana Barragan-Sanchez asserted that an unidentified extension of a wiretap was invalid; failed to set forth the complete results obtained from the interception; failed for the reasons set forth as to the unidentified original application; was unlawful because it authorized interceptions for a period longer than was necessary to achieve the purposes for which it was granted; and the intercepting officers failed to serve inventories within the time allotted.   Id.   Susana Barragan-Sanchez filed no memorandum in support of this motion, made no argument at the hearing and provided no evidence to support her position.

"At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that

Barragan-Sanchez argued that the July 12, 2011 application for the interception of wired communications did not establish that the only reasonable method of developing necessary evidence was to intercept private telephone communications because the Government failed to establish that normal investigation procedures had been tried and failed.  See Defendant Adelaida Barragan-Sanchez's Memorandum of her Motion to Suppress Evidence Seized as a Result of Illegal Wire Taps [Docket No. 455], pp. 1, 4.  In particular, Barragan-Sanchez asserted that seeking telephone intercepts over Target Telephone #1 ("TT-1") was not necessary because the Government had already been successful in its investigation of the Drug Trafficking

---

evidence, statements or a witness identification should be suppressed." Edwards, 563 F. Supp.2d at, 994 (citing United States v. Starks, 193 F.R.D. 624, 629 (D. Minn. 2000) (quoting United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir.), cert. denied 431 U.S. 932 (1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.")); see also United States. v. Torres, NO. 10-CR-0339(8) (PJS/JJK), 2011 WL 3035215 at *2 (D. Minn. July 07, 2011) (same) (citation omitted).    As the court in Starks observed, "even in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality."  193 F.R.D. at 629; see also United States v. Diezel, 608 F.2d 204, 207 (5th Cir. 1979) ("As this Court said in United States v. Evans, 572 F.2d 455, 486 (5th Cir. 1978), cert. denied 439 U.S. 870 (1978), 'The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed.'").  In short, "[f]ailure to provide the Court with any support for the motion is a sufficient basis for denial of the motion." United States v. Rosetter, Crim. No. 10–83 (JNE/JSM), 2010 WL 5184991 at *23 (D. Minn. Oct. 1, 2010); see also Torres, 2011 WL 3035215 at *2 (denying motion to suppress evidence from electronic surveillance on this basis).

Because neither Montenegro, Delforin nor Susana Barragan-Sanchez provided this Court with any evidence or legal argument as to why their respective motions to suppress should be granted, this Court recommends that their motions should be denied on that basis.  The Court will not (and cannot) divine a constitutional violation for these defendants, particularly given the multitude of applications for intercepting wire communications in this case.  That is the job of their attorneys.

Organization ("DTO") being investigated and had already created probable cause to arrest its perceived leaders and perceived accomplices, including: (1) a cooperating source made controlled buys of methamphetamine from a suspected member of the DTO and the cooperating source had provided to officers that he had contacted Magana-Farias, the suspected head of the DTO and other defendants to arrange for the transactions; (2) officers knew where defendant Oceguara resided and a second cooperating source had provided information to law enforcement that Oceguara and his girlfriend had been bringing methamphetamine to Minnesota; (3) via a pen register, officers were able to seize a large amount of currency from defendant Montenegro; (4) via a contact from a cooperating source, law enforcement already had contact with Magana-Farias and thus, the wiretap was not necessary; and (5) officers had contacts with number of cooperating sources providing information regarding the DTO and its participants. Id., pp. 2-5.

The Government disagreed, contending that the goal of the investigation was not to gather evidence about the sporadic drug sales of a few individuals, but to obtain direct evidence that would convince a jury beyond a reasonable doubt of the full scope, methods, extent and personnel involved in the DTO conspiracy; the identity and role of all those involved, including the suppliers, sellers, buyers, couriers, financiers and others; the period of the operation; the management, the disposition and money laundering of the proceeds; and the identity of the assets held under fictitious names. See Govt. Mem., pp. 16-17. The Government argued that the application set forth the multiple conventional methods used and that these methods were unable to meet the

goals of the investigation. Id., p. 17. Further, the Government asserted that if the Court were to accept Barragan-Sanchez's contention that the wiretap information was not necessary because of all of the information that officers had obtained in the investigation, no wiretap would ever be issued because the existence of probable cause needed for the issuance of a wiretap would always negate the necessity requirement. Id. In the alternative, the Government argued that the "good faith exception" adopted in United States v. Leon, 468 U.S. 897 (1984) requires that the suppression motion be denied. Id.

A.    **Factual Background**

On July 12, 2011, Special Agent Sean Harris ("Agent Harris") submitted an Affidavit in support of an application for the interception of wire communications over TT-1. See Govt. Ex. 6. The affidavit provided that the interception of wire communications over TT-1 was necessary to obtain direct evidence that would convince a jury beyond a reasonable doubt of the full scope, methods, extent and personnel involved in the DTO conspiracy; the identity and role of all those involved, including the suppliers, sellers, buyers, couriers, financiers and others involved; the period of the DTO operation; the management, the disposition and money laundering of the proceeds obtained by the DTO; and the identity of assets held under fictitious names. Id., ¶ 71. Agent Harris then discussed the conventional investigative techniques used that had not provided specifically sufficient information as to the conduct, participation and scope of the conspiracy to obtain criminal convictions for all of the co-conspirators in the investigation and the DTO's ultimate source. Id., ¶ 72.

40

Agent Harris described the use of three confidential sources of information and two cooperating defendants that had provided detailed information regarding the DTO and its members, including one of the confidential sources who made purchases of methamphetamine from several members of the DTO. Id., ¶ 73. Agent Harris described seven separate controlled purchases from the DTO. Id., ¶ 41. The cooperating source made arrangements to make purchases of methamphetamine from Magana-Farias, defendant Miguel Angel Sanchez-Rodriguez ("Sanchez-Rodriguez") and Javier Hernandez-Coria ("Hernandez-Coria"). Id., ¶ 42. These contacts were recorded and confirmed by looking at the source's telephone to verify the number dialed. Id. The affidavit established that these controlled buys through the confidential sources were arranged by either Magana-Farias, Sanchez-Rodriguez or Hernandez-Coria and that the transactions were performed by Sanchez-Rodriguez, Hernandez-Coria or other runners. Id., ¶¶ 43-64. On April 5, 2011, confidential sources also learned from Sanchez-Rodriguez that Magana-Farias was in California and that he would be returning to Minnesota soon with more methamphetamine. Id., ¶ 48. In addition, the confidential sources provided information that they had made purchases of methamphetamine from Oceguara, and that Montenegro had transported drugs from the west coast to Minnesota and currency back for the DTO. Id., ¶¶ 32-35, 39. The confidential sources were not sure of the source of Oceguara's narcotics in Minnesota. Id., ¶ 40. Using surveillance, officers observed Montenegro have contact with Hernandez-Coria and then subsequently used a pen register to track that she had left the Twin Cities; the officers passed the information along to agents in Nebraska, which

41

led to the stop of Montenegro's vehicle and the seizure of approximately $159,000.  Id., ¶¶ 37, 38.

Agent Harris stated that the testimony of the confidential sources was not sufficient to obtain a conviction of the leaders of the DTO, the integral members of the DTO and others involved in the DTO.  Id., ¶ 73.  While these sources of information could identify some of the members of DTO, they could not reveal the full scope of the conspiracy.  Id., ¶ 75.  In addition, Agent Harris was concerned that the confidential sources would be reluctant to testify regarding the information they provided to the investigation due to their possible fear of retaliation.  Id., ¶ 74.

Agent Harris also discussed the use of undercover investigations and provided that a confidential source believed that Magana-Farias and Sanchez-Rodriguez would not meet with an outsider with whom they had not conducted business in the past; in his experience such undercover investigations would only be limited to one or two targets, which would not address the entire DTO; and there was no avenue known by which an undercover agent could be inserted into the DTO.  Id., ¶ 76.

Agent Harris addressed the use of physical surveillance.  According to Agent Harris, surveillance does not typically provide details of the exact content of drug transactions and is best used to corroborate intercepted conversations and to identify co-conspirators.  Id., ¶¶ 77, 78.  Agent Harris noted that the surveillance of Sanchez-Rodriguez, the runner for the DTO, had not yielded the location of Magana-Farias.  Id., ¶ 79.  In addition, there were several instances where subjects of surveillance would use erratic driving techniques as a method of evading surveillance.  Id., ¶¶ 81-83.

Agent Harris noted that agents experienced difficulty in conducting surveillance of participants who live in apartments because it was difficult to conduct surveillance of an apartment unit within a common hallway.  Id., ¶ 84.  As to Magana-Farias, it was believed that he generally resided in California and possibly stayed at a number of locations in Minnesota, making it difficult to locate his whereabouts.  Id., ¶ 85.

Agent Harris opined that continued surveillance would not provide sufficient information as to the conduct, participation and scope of the conspiracy needed to obtain convictions of the leaders, integral members and other participants of the DTO and would not reveal the full scope of the conspiracy without the requested electronic surveillance; continued surveillance would likely be detected by the subjects of the investigation and cause them to be more cautious and compromise the safety of informants; and surveillance is normally used to confirm meetings, identify people, locations and vehicles used in the furtherance of the conspiracy.  Id., ¶ 86-89.  According to Agent Harris, surveillance does not typically provide details of the exact purpose or content of the meeting except by inference.  Id., ¶ 89.  Agent Harris also noted the difficulties with starting a surveillance operation due to the use of prepaid cell phones that do not require the holder to provide their real name or address.  Id., ¶ 89.

Agent Harris stated that the use of search warrants did not appear to be a useful investigatory technique given that large-scale drug traffickers often utilize several locations to conceal controlled substances and proceeds in order to minimize the risk of discovery during the execution of a search warrant, including the removal of contraband from other locations once the execution of search warrant is conducted at one location.

Id., ¶ 92.   Further, given the believed scope of this organization and the money laundering involved, a search warrant at one location was not likely to yield evidence incriminating all or most of the participants at any one location.   Id.   In addition, Agent Harris stated that based on his experience, there is a finite period of time between the delivery of drugs, their subsequent distribution and the gathering of proceeds.   Id., ¶ 93. As such, the execution of the search warrant without knowledge of when a co-conspirator would be in possession of contraband or proceeds creates on a random chance of discovering all the pertinent evidence.   Id.   The execution of search warrants was also not feasible because it would alert the subjects to the scope of the investigation and would not likely yield evidence sufficient to prosecute interstate couriers and sources.   Id., ¶ 95.

Agent Harris concluded that pen registers and toll records have been valuable tools in the investigation in identifying the objects of the investigation and the methods of communications.   Id., ¶ 96.   However, these tools can only confirm contact between two telephones.   Id.   This information, coupled with physical surveillance, can only confirm contact and not the substance of a conversation.   Id., ¶¶ 96-97.   In other words, the content of conversation is not ascertainable by these tools.   Id.

According Agent Harris, officers attempted a trash search that yielded no results. Id., ¶ 98.   Further, Agent Harris opinioned that trash searches at the suspected residences of Sanchez-Rodriguez or Hernandez-Coria were impractical because they lived in an apartment complex making it difficult to associate any discovered contraband to a specific apartment.   Id.   A trash search of Magana-Farias' residence was

impossible because officers did not know the location of any of his residences.  Id., ¶ 99.  To the extent that such a search would be useful, it would only relate to obtaining a search warrant, which would be of a limited benefit as stated above.  Id., ¶ 100.

The use of a grand jury subpoena would only serve to obtain information from sources that have already provided information and actual targets of the investigation would likely invoke their Fifth Amendment privilege against self-incrimination.  Id., ¶¶ 101-103.  Granting immunity to the targets would result in a lack of prosecution of some of the most culpable individuals.  Id., ¶ 103.  In addition, the issuance of subpoenas to lower level members of an organization would likely lead to the notification of other conspirators as to the existence of the investigation, making them more cautious in their activities, causing them to flee, threatening the lives of informants or otherwise compromising the investigation.  Id., ¶ 104.

Agent Harris stated that a financial investigation into the trafficking operation was underway, but he did not think it would be of much assistance because it was believed that the assets of the DTO and its principals were being held under the names of others in order to evade detection.   Id., ¶ 105.   He also noted that such an investigation was not likely to reveal the full scope of the conspiracy.   Id.

Given that normal methods of investigation appeared unlikely to succeed if tried or continued, Agent Harris requested an authorization for a 30-day interception of wire communication over TT-1.  Id., ¶ 106.  Agent Harris testified at the hearing that the goal was not to just arrest a few individuals from the organization using controlled buys, but

to identify the sources of the narcotics, the sources of the money, and all of the co-conspirators.  Tr. 195-96.

Agent Harris represented that all interceptions of communications would be minimized pursuant to the minimization requirement of Chapter 119 of Title 18, United States Code.  Specifically, he stated:

> Interception will be suspended immediately when it is determined that the conversation is unrelated to communications subject to interceptions under Chapter 119 of Title 18, United States Code. Interceptions will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Monitoring will cease immediately when it is determined that the conversation is between a violator and her/his spouse, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Spot monitoring of non-criminal conversation will be done to ensure that those conversations have not turned criminal in nature.

See Govt. Ex. 6, ¶ 110.

At the hearing, Agent Harris testified that monitors were instructed to listen for two minutes, and if the conversation did not pertain to the investigation, they were directed to stop listening and then check every 30 seconds for about 4-5 seconds to ensure that conversation had not gone into the issue of narcotics trafficking.  Tr. 185. When officers were not listening, the equipment was turned off, including the recording equipment.  Id.  In addition, monitors were told to cease monitoring as to some privileged conversations, be it with a cleric or a religious figure, as well as with an

46

attorney, doctor or other health care provider, subject to 30-second spot-checking.  Tr. 185-86.  The monitors were provided with a minimization memorandum outlining these procedures.  Tr. 187; Govt. Ex. 41.  Agent Harris testified that he kept track of the monitoring and issued a report on the minimizations used.  Tr. 188; Govt. Ex. 42.

On July 12, 2011 United States District Judge Donovan W. Frank issued an order authorizing the interception of wire communications from TT-1 for a period of 30 days, finding that there was probable cause to believe that the targets of the interception have been and continuing to commit narcotic trafficking crimes and the interception of communications from TT-1 will concern communications dealing with the commission of narcotics crimes.  See Govt. Ex. 7.

**B.**    **Analysis**

As stated previously, Barragan-Sanchez challenged the wiretap of TT-1 based on necessity arguing that in seeking a court authorization for the wiretap, the Government failed to satisfy the prerequisite of necessity as required by 18 U.S.C. § 2518.

The necessity requirement of § 2518 insures "'that wiretaps are not routinely employed as the initial step in an investigation.'"  United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003) (quoting United States v. Thompson, 210 F.3d 855, 858-859 (8th Cir.), cert. denied, 532 U.S. 996 (2000), quoting, in turn, United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir.), cert. denied, 513 U.S. 1031 (1994)).  "To satisfy the requirement, an application requesting a wiretap order must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed

or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Jackson, 345 F.3d at 644 (quoting 18 U.S.C. § 2518(1)(c)).  However, the necessity requirement does not "require that law enforcement officers 'exhaust all possible techniques before applying for a wiretap.'"  Thompson, 210 F.3d at 859 (quoting United States v. Shaw, 94 F.3d 438, 441 (8th Cir.), cert. denied, 519 U.S. 1100 (1997)) (citation omitted).

Here, the wiretap of TT-1 was not utilized as the initial step in the investigation of the DTO or Barragan-Sanchez's involvement in it.  Agent Harris explained the various investigative techniques that had been used to achieve the goals of the investigation – to locate and learn the identity of members of the DTO; the scope of the organization's activities; the period of its operation; the management, the disposition and money laundering of the proceeds; and the identity of the assets held under fictitious names – and the information officers had obtained from these tools.  For example, officers had obtained information from confidential sources and surveillance regarding Magana-Farias, Sanchez-Rodriguez and Hernandez-Coria's involvement in drug trafficking for the DTO, and from the employment of pen registers, surveillance and a confidential source, officers were able to seize a large amount of money from Montenegro's vehicle. However, Barragan-Sanchez confuses the success of particular investigation or tool with the determination that the necessity requirement was not met.  Here, both the application and testimony of Agent Harris made clear that despite some successes in their investigation, law enforcement were still trying to track down the ultimate source of the narcotics and the monetary support for the DTO.  In addition, the affidavit set forth

the reasons why use of tools such as search warrants, further surveillance, further pen registers, confidential sources of information, undercover agents, trash searches and grand jury subpoenas, had not been successful to date and were not likely to achieve the objectives of the investigation in the future.

The Court concludes that officers had exhausted their attempts to identify and locate the ultimate source of the narcotics and monetary support of the DTO.  In addition, Court concludes the affidavit sufficiently sets forth why additional techniques would not be effective to achieve the overall objectives of the investigation.  As such, the Court finds that the Government has met its statutory duty with respect to a statement of necessity, and Barragan-Sanchez's motion to suppress the evidence obtained from the interception of TT-1 is denied.[6]

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.     Adelaida Barragan-Sanchez's Motion for Suppression of Evidence from Search and Seizure [Docket No. 194] be **DENIED**;

2.     Adelaida Barragan-Sanchez's Motion to Suppress Statements [Docket No. 195] be **DENIED** as moot based on the representations of defendant's counsel at the hearing;

---

[6]     This Court will not discuss the <u>Leon</u> exception since it has determined that sufficient necessity existed for the issuance of the wiretap.

3.     Adelaida Barragan-Sanchez's Motion to Suppress Evidence from Interception of Wire or Oral Communication [Docket No. 196] be **DENIED**;

4.     Erika Romero Montenegro's Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping [Docket No, 220] be **DENIED**;

5.     Erika Romero Montenegro's Motion to Suppress Confession or Statement in the Nature of the Confessions [Docket No. 221] be **DENIED**;

6.     Erika Romero Montenegro's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment [Docket No. 222] be **DENIED**.

7.     Robert Alan Delforin's Motion to Suppress any Statements Made by Defendant [Docket No. 293] be **DENIED**;

8.     Robert Alan Delforin's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Searches [Docket No. 294] be **DENIED**;

9.     Robert Alan Delforin's Motion to Suppress any Identification of Defendant [Docket No. 295] be **DENIED**;

10.     Robert Alan Delforin's Motion to Suppress Evidence of Electronic Surveillance and Wiretapping [Docket No. 296] be **DENIED**;

11.     Susana Barragan-Sanchez's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Derivative Device [Docket No. 336] be **DENIED**;

12.     Harold James Hurley's Motion for Suppression of Evidence Obtained by Electronic Surveillance [Docket No. 338] is **WITHDRAWN** based on the representation of defendant's counsel at the hearing;

13.     Harold James Hurley's Motion to Suppress Statements [Docket No. 339]

be **DENIED**; and

14.     Harold James Hurley's Motion to Suppress Evidence Obtained Through

Illegal Search [Docket No, 340] be **DENIED**.


Dated:  January 25, 2012

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge




Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 8, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **February 8, 2012**.